FILED
United States Court of Appeals
Tenth Circuit

February 5, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

DARWIN DESMOND BROWN,

      Petitioner - Appellant,

v.

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellee.

No. 06-5071

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 00-CV-91-K)**

James L. Hankins, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer B. Miller, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma, with her on the brief), for Respondent-Appellee.

Before **HENRY,** Chief Judge, **LUCERO** and **HARTZ**, Circuit Judges.

**HENRY**, Chief Judge.

An Oklahoma County district court jury convicted Darwin Brown of one count of first-degree murder, OKLA. STAT. tit. 21, § 701.7(A) & (B), and one count of robbery with a dangerous weapon, OKLA. STAT. tit. 21, § 801. As to the

murder conviction, the jury found three aggravating circumstances, and imposed

the death penalty. The jury sentenced Mr. Brown to life imprisonment for the

robbery conviction. The Oklahoma Court of Criminal Appeals (OCCA) affirmed

Mr. Brown's convictions and sentences on direct appeal, *see Brown v. State*, 989

P.2d 913 (Okla. Crim. App. 1998), and also denied his motion for post-conviction

relief.

Subsequently, Mr. Brown filed a 28 U.S.C. § 2254 habeas corpus petition

in the United States District Court for the Northern District of Oklahoma,

asserting ten grounds for relief:

> (1) the use of dual juries constituted structural error;
> (2) the trial court conducted improper voir dire by excusing improperly for cause six jurors whose views on the death penalty would not substantially impair their ability to consider all punishment options;
> (3) the introduction of evidence arising out of Mr. Brown's warrantless arrest violated his 4th, 8th, and 14th Amendment rights;
> (4) Mr. Brown's convictions and death sentence were the product of a fundamentally unfair adjudicatory process infused with prosecutorial misconduct and unfairly prejudicial photographic evidence in violation of the 8th and 14th Amendments;
> (5) the trial court committed constitutional error in denying his requested jury instructions on non-capital offenses;
> (6) the State introduced insufficient evidence to support the "especially heinous, atrocious, or cruel" aggravating factor in violation of his rights under the 8th and 14th Amendments, and the aggravator itself is unconstitutional;
> (7) the "continuing threat" aggravating circumstance is unconstitutional and was not supported by the evidence;
> (8) the "avoid arrest" aggravating circumstance was applied in an unconstitutional manner;
> (9) victim impact evidence violated his 8th and 14th Amendment rights; and
> (10) cumulative error.

2

The district court denied Mr. Brown's petition, but, pursuant to 28 U.S.C. § 2253(c)(1)(A), granted a certificate of appealability on each of his claims. Upon thorough review of the record and the applicable law, and under the standard of review imposed by Congress, we conclude that Mr. Brown is not entitled to relief on any of his claims. We therefore affirm the district court's denial of his § 2254 petition.

## I. FACTUAL BACKGROUND

The following facts are largely taken from the direct appeal opinion of the OCCA. *See Brown*, 989 P.2d at 919-20. One of Mr. Brown's three codefendants, Michael Wilson, was employed at the QuikTrip convenience store located at 215 North Garnett Road in Tulsa, Oklahoma, where Richard Yost also worked. Mr. Brown, Mr. Wilson, Billy Alverson, and Richard Harjo came into the store during the early morning hours of February 26, 1995, and waited for the most opportune time to accost Mr. Yost. The QuikTrip surveillance camera captured the events as they unfolded.

Mr. Yost was cleaning the windows on the coolers when all of the defendants surrounded him, attacked him, and dragged him to the back room. Mr. Alverson came back out and picked up some items that were knocked from the shelves. He also kept watch for customers. A few moments later, Mr. Alverson and Mr. Harjo walked out the front door of the store. While they were going out, Mr. Yost was yelling and screaming for help, possibly thinking that a customer

3

had entered the store. Mr. Alverson and Mr. Harjo re-entered the store and returned to the back room with Mr. Harjo carrying a black aluminum baseball bat. The surveillance camera picked up the sounds of what appeared to be the bat striking Mr. Yost. Circumstantial evidence showed that the bat struck the handcuffs on Mr. Yost's wrists, which he was holding above his head to ward off the blows.

During this time, Mr. Wilson walked from the back room, checked his hands, put on a QuikTrip jacket, got behind the counter, and tried to move the safe. While Mr. Wilson was behind the counter, several customers came in. Mr. Wilson greeted them, sold them merchandise, then said "thank you, come again" or "have a nice day." 989 P.2d at 920.

All this time, Mr. Wilson continued to try to pull the safe from underneath the counter. He took money from the cash drawer and the currency change machine. At some point after this, Mr. Wilson left the counter area, and the video went blank as the tape was taken from the recorder. Mr. Brown was never seen exiting the back room from the time that Mr. Yost was dragged into the room until the video recorder was stopped. The defendants then loaded two safes into Mr. Wilson's car using a dolly from QuikTrip.

At about 6:00 a.m., Larry Wiseman, a customer, discovered Mr. Yost's body lying on the floor in a pool of blood, milk, and beer. Duct tape bound Mr. Yost's ankles. There was one handcuff near his body.

4

Detectives learned that Mr. Wilson was at the store between the hours of 4:00 a.m. and 6:00 a.m. Mr. Wilson failed to show up for work at the scheduled time of 3:00 p.m. on the same day. Officer Allen set up surveillance on Mr. Wilson's house, and at about 4:00 p.m., he saw Mr. Wilson get into a gray vehicle. The officers stopped the vehicle and took the four defendants into custody. The officers recovered a large number of five dollar bills from Mr. Harjo at the site of the stop. Later, at the police station, the authorities recovered money from all of the defendants except Mr. Wilson.

The officers searched Mr. Alverson's home, where they discovered the drop safe, the dolly, QuikTrip glass cleaner, money tubes, and the store surveillance videotape. The officers searched Mr. Wilson's house but found nothing of value.

The next day Mr. Wilson's mother called Officer Makinson to come to her house. Once there, the detectives found several items of evidence on the front porch, including the baseball bat, a bloody QuikTrip jacket with Mr. Yost's name on it, Mr. Wilson's Nike jacket matching the one worn in the store video, and the other cuff of the set of handcuffs.

## II. STANDARD OF REVIEW

The majority of Mr. Brown's claims were adjudicated by the OCCA. Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Mr. Brown may only obtain federal habeas relief on these claims if the OCCA's decision is "contrary to, or involved an unreasonable application of, clearly established

5

Federal law," or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 402 (2000); *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1819 (2007). As to the claims that the OCCA has already adjudicated on direct appeal, we apply this standard from § 2254(d).

In conducting this inquiry, we presume the factual findings of the state trial and appellate courts are correct, and we place the burden of rebutting this presumption by clear and convincing evidence on the petitioner. 28 U.S.C. § 2254(e)(1). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." *Id.*

As to claims that the OCCA did not decide on the merits and that are not procedurally barred, we may exercise our independent judgment. *See LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999). Because § 2254's deferential standard of review does not apply, we review the district court's legal conclusions de novo and its factual findings for clear error. *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). If the district court's factual findings depend entirely on the state court record, we independently review that record. *Walker v. Gibson*, 228

6

F.3d 1217, 1225 (10th Cir. 2000).

# III. DISCUSSION

## A. Dual Juries

The Oklahoma County District Court tried Mr. Brown and Mr. Wilson together, but submitted the charges to two different juries. Mr. Brown contends that the use of this dual jury approach is structural error. In the alternative, he contends that the use of dual juries prejudiced his defense in this case.

Under Oklahoma's Guidelines Governing Juries in Criminal Trials, when using this dual-jury procedure,

> Both juries will be seated in the jury box and the evidence pertaining to both defendants will be presented to both juries simultaneously. Evidence admissible as to one co-defendant shall be presented to that defendant's jury only.

*See Cohee v. State*, 942 P.2d 211, 213 (Okla. Crim. App. 1997) (quoting the Guidelines).

We consider Mr. Brown's structural error argument first, because if we find such error, it is not amenable to harmless error review. *Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993) ("The existence of such defects . . . requires automatic reversal of the conviction because they infect the entire trial process.").

### 1. The use of dual juries is not structural error

Mr. Brown argues that the use of the dual jury approach constitutes structural error because it is experimental, citing the now reversed Ninth Circuit

opinion in *Lambright v. Stewart*, 167 F.3d 477, 484 (9th Cir.) ("Nothing Justice Brandeis ever said about the virtue of states as laboratories comes close to sanctioning this type of unguided experiment."), *rev'd*, 191 F.3d 1181, 1186 (9th Cir. 1999) (en banc) ("We are satisfied that the use of dual juries can actually palliate, rather than exacerbate, the risks of a joint trial."). As Mr. Brown concedes, every federal appellate court that has considered a dual jury system has finally concluded that its use is not structural error, and we conclude the same. *See*, *e.g.*, *Lambright*, 191 F.3d at 1186 (finding no violation of due process or any other trial right in the use of dual juries in a capital case); *Smith v. DeRobertis*, 758 F.2d 1151, 1152 (7th Cir. 1985) ("A defendant is more likely to be prejudiced in the eyes of the jury by being tried with another defendant than by being tried in the presence of a second jury concerned with the other defendant; indeed, the double-jury procedure may reduce the prejudice from being tried jointly with another-a form of prejudice usually held outweighed by the economies of joint trials."); *United States v. Lewis*, 716 F.2d 16, 19 (D.C. Cir. 1983) ("We accept the dual jury procedure so long as it comports with the ethos of due process commanded by our stringent rules of due process."); *United States v. Hayes*, 676 F.2d 1359, 1366 (11th Cir. 1982) (rejecting a challenge to the use of multiple juries and noting that "neither [defendant] has alleged any more than a possibility of generalized harm").

*2. Dual juries and cross-examination*

Mr. Brown next argues that the implementation of the dual jury mechanism prejudiced his defense by stifling effective cross-examination and creating a conflict of interest in defense counsel's representation of him at trial. For example, to the extent Mr. Brown and Mr. Wilson maintained antagonistic defenses, his counsel had to seek permission to remove Mr. Wilson's jury from the courtroom. Similarly, in his questioning, Mr. Brown's counsel was required to take extra precautions not imposed upon most defendants. He needed to prepare his case jointly and thus presented Mr. Brown's defense with a potentially less effective strategy, so as to avoid the courtroom disruptions that would have resulted from the removal of Mr. Wilson's jury. There is little doubt, he argues, that the physical uprooting of the jury at too many turns would only impress upon the exiting jury that something was amiss.

The trial court recognized that counsel "would have to work a little harder." *Brown*, 989 P.2d at 921. It instructed the juries that each would at times leave the courtroom, and that they could "not attempt to draw any inference, or come to any conclusions, or guess at what evidence may be presented or is being presented at the time when [it was] outside of the courtroom." *Id.* at 921-22. Based largely on these cautionary instructions, the OCCA concluded that the dual system did not prejudice Mr. Brown.

In our view, the OCCA's rejection of Mr. Brown's challenge to the use of

9

dual juries was not an unreasonable application of federal law. The trial court was careful and meticulous in its instructions. The OCCA plausibly reasoned that the trial court's instructions to the juries about leaving the courtroom adequately resolved concerns about the prejudicial effects of the practice.

Similarly, as the OCCA reasoned, counsel could diffuse any conflict of interest he encountered by informing the judge when his questions might lead to answers that would not be admissible in the codefendant's trial. And, in the end, counsel could object. We acknowledge that counsel had to be more prepared, anticipating the impact of certain lines of questioning. Thus, the dual jury system may well impose unique burdens upon defense counsel not typically present in a criminal jury trial. Here, however, Mr. Brown does not point to specific instances where he was prejudiced, nor has our review of the record revealed any.

## B. Voir dire

"A defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors." *Sallahdin v. Gibson*, 275 F.3d 1211, 1222-23 (10th Cir. 2002). Mr. Brown maintains that the trial court's exclusion of six veniremen violated the standard set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985). In *Witt*, the Supreme Court explained that a prospective juror may be excluded for cause because of his or her views on capital punishment when "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424

10

(internal quotation marks omitted).  The OCCA correctly stated that the *Witt* test is the "proper inquiry."  989 P.2d at 922.

In conducting this inquiry, the trial court must determine "whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment."  *United States v. Chanthadara*, 230 F.3d 1237, 1270 (10th Cir. 2000) (internal quotation marks omitted).  "The trial court, however, retains great latitude in conducting voir dire, and the Constitution does not require an additional opportunity to make a searching inquiry."  *Sallahdin*, 275 F.3d at 1223 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) and *Moore v. Gibson*, 195 F.3d 1152, 1170 (10th Cir. 1999)).  "A trial judge's determination of a potential juror's bias under this standard is a factual finding entitled to a presumption of correctness."  *Moore,* 195 F.3d at 1168 (internal citations omitted).

Here, the OCCA summarized the voir dire as follows:

THE COURT: . . . Mr. Monroe, . . . if convicted, . . . it is the duty of the jury to impose punishment. . . .  [The punishment options] are, number one, life in the penitentiary; number two, life in the penitentiary without the possibility of parole, and number three, the death penalty.  Mr. Monroe, are you opposed to or in favor of the death penalty?

MR. MONROE: I am opposed to the death penalty.

THE COURT: . . . Would your opposition to the death penalty prevent or substantially impair your ability to find the defendant guilty if the law and the evidence so warrants, because the death penalty could be imposed?

MR. MONROE: No.

11

THE COURT: . . . If this case should reach the penalty phase, would you automatically vote against the death penalty, regardless of the evidence and the law, that is presented to you while this Court is in session?

MR. MONROE: Yes, I would, sir.

Thereupon, [the court determined that] the juror would be excused for cause without any further inquiry. . . . Jurors Akers, LaPage and Ross answered the questions just as Monroe answered, and they too were excused for cause.

Juror Borens first stated that she was opposed to the death penalty but would not automatically vote against it. On further voir dire from the State and the trial court, Borens was asked if she would consider the death penalty. She stated that she would not consider the death penalty. Juror Sicks initially indicated that she was opposed to the death penalty and she "would have to vote not in favor of the death penalty." Under further inquiry by the trial court wherein the trial court asked, "you would not consider all three of the penalty options, or you would consider all three of the penalty options?" Sicks said "I do not think I could consider the death penalty." The trial court further inquired by asking "Are you telling me that in no circumstances could you impose the death penalty?" Sicks responded, "it would be very hard. I don't know that I could morally do that." In an attempt to clarify Sicks position, the trial court asked, "Are you telling me that under no circumstances could you impose the death penalty? . . . . [I]f we came to the sentencing stage you would have three options. Are you telling me you would not consider the third option?" Sicks replied, "I would not consider it." Sicks was then excused.

Of all the jurors Brown complains about, only Sicks was asked specifically if she would impose the death penalty. Even in voir dire the trial court corrected itself and correctly asked if she could consider the death penalty.

989 P.2d at 922-23.

In reviewing the trial court's voir dire, the OCCA also observed that

The potential jurors Brown complains were improperly removed clearly stated that they would not consider the death penalty or would

12

automatically vote against the death penalty. Although the trial court's voir dire was not a model of perfection, the jurors were properly removed.

*Id.* at 923. The OCCA encouraged trial courts to follow the preferred approach, utilizing the voir dire questions set forth in OUJI-CR 2d, 1-5 (1996).[1]

---

[1] OUJI-CR 2d, 1-5 provides the following instructions regarding voir dire in capital cases:

Alternate 2 (Death Penalty)

The defendant is charged with murder in the first degree. It will be the duty of the jury to determine whether the defendant is guilty or not guilty after considering the evidence and instructions of law presented in court.

If the jury finds beyond a reasonable doubt that the defendant is guilty of murder in the first degree, the jury will then have the duty to assess punishment. The punishment for murder in the first degree is death, imprisonment for life without parole or imprisonment for life.

If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments—death, imprisonment for life without parole or imprisonment for life—and impose the one warranted by the law and evidence?

[If the answer to the preceding question is negative]

If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death/(imprisonment for life without parole)/(imprisonment for life), are your reservations about the penalty of death/(imprisonment for life without parole)/(imprisonment for life) so strong that regardless of the law, the facts and circumstances of the case, you would not impose the penalty of death/(imprisonment for life without parole)/(imprisonment for life)?

13

In reviewing the trial court's questioning, we defer to its findings regarding whether a juror is biased and whether her answers can be believed. *Witt*, 469 U.S. at 424-26. The Supreme Court has recently emphasized the import of this deferential approach, noting that a federal court reviewing a habeas petition "owe[s] deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown*, 127 S. Ct. 2218, 2231 (2007). Further,

> The need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment. *But where, as here, there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire, the trial court has broad discretion.*

*Id.* at 2230 (emphasis added).

Mr. Brown contends that "the six veniremen . . . expressed ambiguous views concerning the issue of capital punishment in [Mr.] Brown's case." Aplt's Br. at 28. "[W]hen there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of [a party].'" *Uttecht*, 127 S. Ct. at 2223 (last alteration added) (quoting *Witt*, 469 U.S. at 434). "This is because the deeply rooted nature of juror bias often precludes discovering it through general fairness and 'follow the law' type questions." *Nicklasson v. Roper*, 491 F.3d 830, 837 (8th Cir. 2007) (quoting *Morgan v. Illinois*, 504 U.S. 719, 734-36 (1992)); *see Witt*,

14

469 U.S. at 424 (observing that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism"). Given our restricted ability to review the trial court's actions, the OCCA's deferring to the judgment of the trial court judge was not an unreasonable and inconsistent application of federal law.

Mr. Brown also argues that, given that this is a capital case, defense counsel should have been given the opportunity to rehabilitate potential jurors. Mr. Brown concedes there is no constitutional right to rehabilitate, and here, we hold that the OCCA did not unreasonably apply federal law when it determined the trial court acted well within its discretion in its handling of this part of the voir dire. *Moore*, 195 F.3d at 1170 (some citations omitted) (holding that "the trial court was not constitutionally required to grant defense counsel an opportunity to conduct a searching inquiry" and noting that "the trial court's decision not to permit further questioning by defense counsel did not exceed the bounds of that court's considerable discretion").

## C. The introduction of Mr. Brown's warrantless arrest

Mr. Brown filed a motion to suppress his statements regarding his involvement in the murder arguing they were the product of an illegal arrest. After the authorities confronted Mr. Brown with evidence that his codefendant Mr. Wilson confessed to the crime and implicated Mr. Brown, he too confessed involvement in the crimes.

15

The OCCA did determine that Mr. Brown's four-hour detention and subsequent interview were illegal. It concluded that

> it was the intention of the officers to first obtain a confession from [a codefendant] while the other [codefendants] were in custody and then use Wilson's confession to prod the others into making incriminating statements. We find that this purposeful and flagrant violation of Brown's basic constitutional rights tainted his statement to police.

989 P.2d at 926.

After the OCCA determined that the illegal arrest tainted the confession, it considered whether the error was harmless. The OCCA examined whether the State shouldered its heavy burden "to demonstrate beyond a reasonable doubt that the illegally obtained statement did not contribute to the conviction." *Id.* at 927. However, rather than shouldering, the State shrugged: it refused to concede that the arrest was illegal, and made no argument as to harmless error.

As the OCCA stated, Mr. Brown's statement revealed the following:

> First, he stated that he was at his girlfriend's house at the time the crime occurred. Then, after being confronted with Wilson's confession, he confessed to being involved in the crime. Brown stated that he and the other codefendants attacked Yost while he was near the freezer area. They took Yost to the back room where he held Yost's arm down while Harjo beat him to death with a baseball bat, striking him fifteen to twenty times. Brown stated that he stayed in the back room the whole time so that no one would enter the back room. Brown stated that Wilson and Alverson planned the robbery two weeks in advance.

989 P.2d at 927.

Despite the State's failure to argue harmless error, the OCCA undertook a sua sponte harmless error analysis and determined that the remainder of the

evidence regarding Mr. Brown's involvement was "substantial." *Id.*

> The State presented the video surveillance tape which captured the defendants attacking Yost and dragging him into the back room. Brown was positively identified on the video surveillance tape and on a thermal image made from the tape. Brown, in the video, is seen dragging Yost into the back room and not coming out during the time the video is running. The diagrams indicate that there is no other way in or out of the back room other than the door shown in the surveillance video. The State presented evidence that Brown was with Wilson and the other two defendants within twelve hours of the crime when officers stopped Alverson's vehicle.

*Id.* The OCCA then held:

> *The video alone was sufficient to show, beyond a reasonable doubt, that Brown was an accomplice in the first degree murder of Yost.* When viewing all of the evidence, excepting Brown's confession, we can honestly say that the introduction of the confession during the first stage of trial was harmless beyond a reasonable doubt. Therefore, Brown's convictions must not be disturbed based on this proposition.

*Id.* (emphasis added).

Although we note Judge Chapel's observation that the illegal arrest was "a very serious constitutional violation," *id.* at 936 (Chapel, J., dissenting), Supreme Court precedent precludes us from addressing this contention directly. Although in general our habeas jurisdiction addresses violations of the United States Constitution, we may not overturn a state criminal conviction because of a violation of the Fourth Amendment if the petitioner had a full and fair opportunity to litigate this claim. *Stone v. Powell*, 428 U.S. 465, 496 (1976) ("[W]e conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment Claim, a state prisoner may not be granted federal habeas

17

corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." (footnote omitted)); *Gilmore v. Marks*, 799 F.2d 51, 55 (3d Cir. 1986) ("[F]or purposes of the *Stone v. Powell* rule, a habeas petitioner's claim that a state appellate court improperly found a Fourth Amendment violation to be harmless does not have a separate identity and may not be raised in a habeas petition in federal court.").

Mr. Brown does not contend that he did not have such an opportunity. Instead he pointlessly seeks a ruling that *Stone* does not apply to capital cases, although we have previously applied it in such cases. *See, e.g.*, *Cannon v. Gibson*, 259 F.3d 1253, 1260-62 (10th Cir. 1999); *Smallwood v. Gibson*, 191 F.3d 1257, 1265 (10th Cir. 1999). Because the OCCA "thoughtfully considered the facts underlying [Mr. Brown's] Fourth Amendment claim and rejected the claim on its merits, applying the appropriate Supreme Court precedent," we agree with the district court that *Stone* bars us from considering this clam. *Smallwood*, 191 F.3d at 1265.

## D. Prosecutorial misconduct

### 1. Sixty-eight instances alleged

Mr. Brown raised multiple (sixty-eight) instances of alleged prosecutorial misconduct involving the State's introduction of gruesome autopsy photographs, race-baiting, the injection of gang evidence into the trial, as well as a litany of other purportedly improper statements and arguments that the prosecutor made.

18

Applying AEDPA's deferential standard of review, we note that "[g]enerally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Alternatively, if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right (rather than the general due process right to a fair trial), a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair." *Id.*

*2. The OCCA's resolution of the prosecutorial misconduct contentions*

In rejecting Mr. Brown's challenge to the prosecution's behavior, the OCCA observed:

> Brown cites sixty-eight instances of alleged prosecutorial misconduct. The misconduct alleged includes comments made during voir dire, comments made during first and second stage opening statements and closing arguments, improper questioning of witnesses, and improper presentation of evidence [gruesome photographs] which was not relevant, or the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, or needless presentation of cumulative evidence.

989 P.2d at 933 (emphasis added). Because defense counsel did not object to most of the prosecution's comments, the OCCA engaged in plain error review of those, and rejected Mr. Brown's contentions. As to those to which defense counsel objected, the trial court did sustain objections to some comments, and the OCCA

19

held that the sustaining of the objections "cured" any error. 989 P.2d at 934. The OCCA also rejected Mr. Brown's argument that introduction of both diagrams of injuries and of videos of the crime scene was duplicative and cumulative. It concluded that "[t]he information was relevant to prove the aggravating circumstances alleged by the State." *Id*. at 934-35.

As to photographs of the crime scene that the prosecution introduced during the first stage, the OCCA held they were relevant (showing the cause of death and the intent of the attacker). They were "properly introduced, and thus there can be no prosecutorial misconduct." *Id.* at 934. As to the photographs of the crime scene and of the deceased that the prosecution introduced during the second stage, the OCCA determined that, without exception, "the probative value is not substantially outweighed by the danger of unfair prejudice." *Id.*

The OCCA did hold that the introduction of one post-autopsy photograph of the interior of the victim's skull was error. Such photos "generally are found to be inadmissible" and the "prejudicial value is great." *Id.* "The probative value is outweighed by the danger of unfair prejudice." *Id*. However, in light of the strength of so much properly admitted evidence, the OCCA found that error to be "harmless." *Id*.

*3. The district court's resolution of the claims*

The district court carefully examined the many challenges Mr. Brown alleged. The district court determined that the trial court's instructions and/or

20

admonishments to the jury cured many of the purported errors. Overall, the district court concluded that these statements did not deprive Mr. Brown of the "fundamental fairness to which he is entitled." Dist. Ct. Rec. doc. 28, at 34. As to the trial court's acknowledged error of admission of the gruesome autopsy photos during the sentencing stage, the district court also determined that this error did not deny Mr. Brown a fundamentally fair trial.

The district court also addressed certain troubling contentions that the OCCA did not specifically mention in its resolution of the multitude of claims. For example, Mr. Brown maintained the prosecutor played the "race card" in offering an audiotape of Mr. Brown's statement. When asked, who did you kill, Mr. Brown responded "Just a white dude." Feb. 20, 1997, Tr. trans. at 75. Defense counsel objected. The trial court overruled the objection but admonished the jury. The district court found, and we agree, that Mr. Brown did not show that the statement rendered the sentencing proceeding unfair.

*4. The OCCA's resolution of the prosecutorial misconduct contentions was not an unreasonable application of federal law*

As to the bulk of Mr. Brown's claims, we agree with the district court's thorough assessment and conclude that the OCCA did not unreasonably apply federal law in rejecting them. As to the autopsy photograph the trial court erroneously admitted during the sentencing stage, we note that the Supreme Court has reiterated the proper standard federal courts must apply in habeas proceedings

21

when considering the effect of a trial court's error. *See Fry v. Pliler*, --- U.S. ----, 127 S. Ct. 2321 (2007). In *Fry*, the Supreme Court held that:

> in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht* [*v. Abrahamson*], 507 U.S. 619 [ (1993) ], whether or not the state appellate court recognized the error . . . .

*Id.* at 2328. Thus, unless the error "had substantial and injurious effect or influence in determining the jury's verdict," the error is harmless. *Brecht*, 507 U.S. at 631 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

In attacking the OCCA's determination, Mr. Brown relies in part on *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003), where we granted relief to the petitioner under the AEDPA standard of review. In *Spears*, photographs depicting the victim with fifty to sixty stab wounds were offered in the sentencing phase of a capital trial to prove conscious physical suffering. The OCCA held that the photographs were not probative for that purpose in light of the uncontradicted evidence that the victim died or lost consciousness early in the beating. *Id.* at 1226-28. Thus, there was no logical connection between the photographs and the proposition they were offered to prove. "[T]he gruesome photographs potentially misled the jury, as they necessarily had a strong impact on the jurors' minds." *Id.* at 1228. Accordingly, the photographs rendered the sentencing stage fundamentally unfair. *Id.*

Here, there is little doubt that the OCCA was correct to hold the admission

of the autopsy photograph to be error. In contrast to *Spears*, however, there is more than "minimal evidence" that Mr. Yost was conscious during the beating, fought back to the extent he could, and endured conscious suffering. 343 F.3d at 1228; *see infra* § III.F.2. As we explain more fully below, even absent this evidence, the prosecution presented sufficient evidence in the sentencing phase to support the statutory aggravating factors. *See infra* § III.F thru III.H. Considering the entirety of the second stage evidence as a whole, and given our "very limited" role, we conclude that the erroneous admission of one gruesome photograph did not have a substantial and injurious effect or influence in determining the jury's verdict. *Thornburg v. Mullin,* 422 F.3d 1113, 1129 (10th Cir. 2005).

**E. Trial court's refusal to give jury instructions on second degree murder**

Mr. Brown next argues that the trial court violated *Beck v. Alabama*, 447 U.S. 625 (1980), when it refused to instruct on the lesser included offenses of second-degree felony murder and second-degree murder involving imminently dangerous conduct. Under *Beck*, "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Id.* at 627. In order to prevail on *Beck* claim, the petitioner must establish that the trial court denied a lesser included offense instruction, and that "he presented sufficient evidence to warrant such an instruction." *Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir.

23

1999). In addition, a "petitioner must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder." *Young v. Sirmons*, 486 F.3d 655, 670 (10th Cir. 2007); *Hooks v. Ward*, 184 F.3d 1206, 1223-29 (10th Cir. 1999) (discussing *Beck*).

The OCCA only addressed the refusal to instruct on the lesser included offense of second-degree felony murder. Before the district court, Mr. Brown emphasized that he also sought an instruction on a second lesser included offense: second-degree murder involving imminently dangerous conduct. The district court found that, in the OCCA proceedings, he had challenged the failure to instruct on both offenses. We will address each in turn.

*1. Second degree felony murder instruction*

Under Oklahoma law, there are two degrees of felony murder: "A person . . . commits the crime of murder in the first degree, regardless of malice, when that person or any other person takes the life of a human being during, or if the death of a human being results from, the commission or attempted commission of [certain listed felonies, including] . . . robbery with a dangerous weapon . . . ." OKLA. STAT. tit. 21, § 701.7. Homicide is murder in the second degree if perpetrated during the course of a felony not listed in § 701.7, such as robbery by force or fear. *Id.*

Mr. Brown maintains that the murder occurred during the course of robbery

by force or fear.  Because robbery by force or fear is a lesser included offense of robbery with a dangerous weapon, he contends that the trial court should have instructed the jury on second-degree felony murder.

The OCCA rejected this claim, stating

> In this case, the evidence clearly showed that the victim was beaten to death with a baseball bat, a dangerous weapon which was used to complete the robbery. Where there is no evidence to support a lesser included offense the court has no right to ask the jury to consider the issue.  *Boyd v. State*, 1992 OK CR 40, ¶ 9, 839 P.2d 1363, 1367-68. There was no evidence other than the evidence that a dangerous weapon was used to commit the robbery. Accordingly, we find no error.

989 P.2d at 930.

We agree with the district court that the OCCA's decision is not an unreasonable application of federal law.  Because the baseball bat was used to complete the robbery, Mr. Brown was not entitled to a second-degree murder instruction based on robbery by force or fear.

*2. Second degree imminent danger murder instruction*

Under Oklahoma law, "[h]omicide is murder in the second degree . . . [w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual."  OKLA. STAT. tit. 21, § 701.8.  Although Mr. Brown now argues that the trial court erred in refusing to instruct the jury on this offense, the State insists that Mr. Brown did not present this contention to the OCCA.  In his direct appeal to the OCCA, Mr. Brown

25

argued:

> THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING THE APPELLANT'S REQUEST THAT THE JURY BE INSTRUCTED ON THE OFFENSE OF SECOND DEGREE MURDER
>
> At the end of the trial's first stage, the Appellant asked the trial court to instruct the jury on the lesser offense of second degree felony murder, submitting certain instructions which were denied. (OR 394-398). As a result, the jury received no instructions on any lesser offenses.
>
> . . . .
>
> The jury's inability to consider any offense other than first degree murder thus violated the Appellant's rights under the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Aplt's Br. to OCCA, at 58-60.

The district court determined that although the bulk of the argument was about the second-degree felony murder instruction, Mr. Brown did fairly present the second-degree imminent danger claim to the OCCA by citing the appropriate record pages with the proffered instruction and arguing generally about the lack of instruction as to any lesser included offenses. Because the OCCA did not examine the claim, the district court decided to engage in an "independent review of the record and pertinent federal law" to determine whether the OCCA's denial of relief was contrary to, or an unreasonable application of, clearly established federal law. Dist. Ct. Rec. doc. 28, at 20-21 (citing *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999)). The district court then rejected this claim.

26

We can assume, without deciding, that Mr. Brown presented his argument to the OCCA, because he loses on the merits in any event.  In reaching our conclusion on the merits, however, we do not apply *Aycox* as the district court did.  In *Aycox*, this court concluded that when a state court issues a summary decision "which does not articulate a reasoned application of federal law to determined facts," we should defer "to the state court's *result* even if its reasoning is not expressly stated."  196 F.3d at 1177 (emphasis in original).  The district court seems to have applied this standard, noting that, after its independent review of the record and federal law, it would determine whether the OCCA's denial of relief was contrary to, or involved an unreasonable application of, clearly established federal law.

However, we hold this case distinguishable from *Aycox*.  Here, rather than issuing a summary decision that resolved *all* of the petitioner's claims, the OCCA only addressed one of Mr. Brown's two distinct *Beck* arguments.  The entirety of the OCCA's analysis indicates that it read proposition nine of Mr. Brown's brief as challenging only the refusal to instruct on second degree felony murder.  Accordingly, our review of the unaddressed *Beck* challenge is governed by the standard of review explained in *Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005):  "If the state court did not decide Mr. Harris's federal claim on the merits, and the claim is not otherwise procedurally barred, *we address the claim de novo and AEDPA deference does not apply.*"  (emphasis supplied).

27

As we have noted, under *Beck*, Mr. Brown was entitled to an instruction on a lesser included non-capital offense if the evidence would have supported a verdict of guilty as to that lesser offense. 447 U.S. at 635. We must look to Oklahoma law to determine what constitutes a lesser included offense. *See Walker v. Attorney Gen. for State of Okla.*, 167 F.3d 1339, 1349 (10th Cir. 1999). (stating that, under *Beck*, "[a] capital defendant is constitutionally entitled to instructions on offenses that *state law* recognizes as lesser included offenses of the charged crime . . . when such instructions are supported by the evidence") (emphasis added).

Although Mr. Brown argues that second degree murder by imminently dangerous conduct is a lesser included offense of first degree felony murder, we conclude that the identification of lesser included offenses is not without difficulty. The OCCA "initially applied a strict statutory elements approach which required all of the elements of the lesser included offense to be contained in the greater offense so that it would be impossible to commit the greater offense without also committing the lesser." *Shrum v. State*, 991 P.2d 1032, 1035 (Okla. Crim. App. 1999); *see, e.g.*, *Jennings v. State*, 643 P.2d 643, 645 (Okl. Crim. App. 1982) (stating that "[t]he elements of a lesser included offense must necessarily be included in the offense charged"). The OCCA later applied looser variations of the elements test, which fell into three categories: "the pleadings approach, the evidence approach and a hybrid of the pleadings and evidence

28

approach." *Shrum*, 991 P.2 at 1035. However, post-*Shrum*, the OCCA applies only the very flexible "evidence test," which "considers not only the elements but looks to the crimes the trial evidence tends to prove." *Shrum*, 991 P.2d at 1036. Because the required application of the evidence test is prospective only to those cases on pending on direct review, Mr. Brown was not entitled to the *Shrum* evidence test. But, because the trial court may very well have applied it, we consider its relevance here.

"[T]he proper test of sufficient evidence for instructions on a lesser included offense is whether *prima facie* evidence of the lesser offense has been presented." *Ball v. State*, 173 P.3d 81, ¶ 32 (Okla. Crim. App. 2007). Under the "evidence test," the court considers "whether the evidence might allow the jury to acquit the defendant of the greater offense and convict him of the lesser." *Jackson v. State*, 146 P.3d 1149, 1159 (Okla. Crim. App. 2006); *Frederick v. State*, 37 P.3d 908, 945 (Okla. Crim. App. 2001) (quoting *Beck,* 447 U.S. at 635 ("In the federal courts, it has long been beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.")) (internal quotation marks omitted).

Under the Oklahoma felony murder statute, the death may occur "regardless of malice," OKLA. STAT. tit. 21, § 701.7(B), and, as a result, felony murder is a general intent crime. *Pickens v. State*, 19 P.3d 866, 879 (Okla. Crim. App. 2001)

29

(stating that "[f]elony murder, with robbery with a dangerous weapon as the underlying predicate crime, is a general intent crime."). Thus, "[t]he defendant's state of mind with respect to the death is irrelevant." *Franks v. Alford*, 820 F.2d 345, 347 (10th Cir. 1987).

In contrast, "the second degree murder [offense] at issue requires 'an act imminently dangerous to another person and evincing a depraved mind.'" *Id.* (quoting OKLA. STAT. tit. 21, § 701.8(1)). Thus, "depraved mind" murder "requires proof of a mental state that felony murder does not." *Id.*

Here, the jury found Mr. Brown guilty of robbery with a dangerous weapon. Because felony murder requires no evidence of an intent to cause the death of a victim, we hold that, in this case, instructing the jury on second degree imminent danger/depraved mind murder would *not* have allowed the jury to acquit Mr. Brown of the greater offense (first degree felony murder) by finding him guilty of the lesser one. *Cf. Jackson*, 146 P.3d at 1159 (applying *Shrum*). We therefore conclude that the trial court did not err in refusing to instruct the jury on imminent danger/depraved mind second-degree murder, and that Mr. Brown is not entitled to habeas relief on this claim.

**F. Heinous, Atrocious or Cruel Aggravator**

Mr. Brown next challenges whether there was sufficient evidence to support the jury's finding that the murder was especially heinous, atrocious, or cruel ("HAC"), and that he was a major participant in the infliction of such suffering.

30

Mr. Brown also challenges the constitutionality of the aggravator.

*1. Sufficiency of evidence that Mr. Yost suffered extreme mental anguish*

When we consider the sufficiency of the evidence on a habeas corpus petition, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We note that our review under this standard is "'sharply limited[,]' and a court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992)).

Sufficiency of the evidence on a habeas petition is a mixed question of law and fact. *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006). We ask whether the facts are correct and whether the law was properly applied to the facts, "which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas." *Id.* In light of the presumption of correctness afforded by 28 U.S.C. § 2254(e), we must defer to any determination of a factual issue by the state court. *Id*

Here, we must consider whether the OCCA's conclusion that the evidence was sufficient to support a finding of extreme mental anguish constituted an

31

unreasonable application of the *Jackson* standard. *See Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (assessing the OCCA's application of *Jackson*). On that question, the OCCA held that

> The medical examiner testified that the first blow by the baseball bat could have rendered him unconscious. However, before the baseball bat was ever introduced into the attack, Yost was attacked and dragged into the back room by his four assailants. Yost screamed for help while Alverson and Harjo retrieved the bat. Obviously he was being restrained at that time by Brown and Wilson. Yost suffered injuries to his hands, arguably coming from the blow from the bat, indicating defensive wounds. There was a piece of metal from the handcuff imbedded in Yost's head indicating that he had his hands between his head and the bat. In the surveillance tape noises can be heard during the attack after the baseball bat was taken to the cooler where Yost was being held. Once the bat arrived, it is possible that Yost was struck and rendered unconscious with one blow. However, we find that before the bat was brought into the attack, Yost had suffered the extreme mental anguish of being held captive, knowing that his ultimate fate rested in the hands of his attackers whom he could identify if left to live.
>
> . . . .
>
> There is ample evidence of the extreme mental anguish suffered by Yost prior to his death. This evidence illustrates the realization by Yost that he was going to be harmed and even killed by the gang of robbers who had overpowered him and dragged him into a back room.

989 P.2d at 930-31.

In our application of *Jackson*, we look to Oklahoma law to determine the substantive elements of the "heinous, atrocious, or cruel" aggravating circumstance. *See Valdez v. Bravo*, 373 F.3d 1093, 1097 (10th Cir. 2004). Under Oklahoma law this aggravating factor "requires proof that the death was preceded by torture or serious physical abuse." *Turrentine v. State*, 965 P.2d 955, 976

32

(Okla. Crim. App. 1998). The OCCA has determined that the "torture" element of this aggravating factor "may take any of several forms":

> Torture may include the infliction of either great physical anguish or extreme mental cruelty. . . . [It] must be the result of intentional acts by the defendant . . . [and] must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created. The length of time which the victim suffers mental anguish is irrelevant.

*Berget v. State*, 824 P.2d 364, 373 (Okla. Crim. App. 1991). The OCCA has also stated that there are no "specific, uniform criteria, applicable to all murder cases, which would make the application of the 'heinous, atrocious or cruel' aggravator a mechanical procedure." *Robinson v. State*, 900 P.2d 389, 401 (Okla. Crim. App. 1995). "Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved." *Id.*

Thus, our inquiry is case by case. *Id.* Here, we agree with the district court's assessment that there was ample evidence that Mr. Yost suffered physical and emotional abuse while conscious. Mr. Yost had defensive wounds on his hands, fingers, and wrist; the videotape revealed that struggle ensued; the autopsy revealed a hinge from handcuffs was embedded in his skull, which indicated that Mr. Yost put his hands in defensive posture; he was bound prior to death, which indicate he was conscious during at least part of the attack. Dist. Ct. Rec. doc. 28, at 50. Mindful of the "Oklahoma test for conscious suffering we have found to satisfy the requirements of the Eighth Amendment," we hold that the OCCA's

33

conclusion that there is sufficient evidence that Mr. Yost suffered serious abuse before becoming unconscious is not an unreasonable application of federal law. *Medlock v. Ward*, 200 F.3d.1314, 1324 (10th Cir. 2000) (Lucero, J., concurring).

### 2. *Sufficiency of evidence that Mr. Brown caused injury*

Mr. Brown next argues that, even if the evidence supports the application of the HAC aggravator, there is insufficient evidence to indicate that he actually physically participated in the beating of Mr. Yost, or that he attempted to kill him, or that he even intended to kill him. The OCCA took little time to dispose of this argument:

> As we stated before, we will presume that the jury convicted Brown under the felony murder theory, so that Brown will be provided the benefit of the prohibition against double jeopardy. We make the same presumption here.
>
> The evidence was clear that Brown substantially participated in the killing. Brown was involved in the initial subduing of Yost. He was present in the back room when the bat was brought in by Harjo. He was present when sounds of the first blow can be heard on the audio/videotape and he remained in the back room until the beating ceased. He had to know that a beating with a baseball bat would cause serious conscious physical suffering and death. Therefore, we find that Brown "was a major participant in the felony committed, who displayed reckless indifference to human life;" therefore, he was "sufficiently culpable to receive the death penalty."

989 P.2d at 931 (citations omitted).

Mr. Brown maintains that under the Supreme Court's holdings in *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1988), the OCCA's rejection of his claim is an unreasonable application of federal law. In

34

*Enmund*, the petitioner, convicted of felony murder, was the getaway driver for a robbery, and was in the car on the side of the road at the time of the killings. The Supreme Court held that he did not act with the culpability required to receive the death penalty. In *Tison*, there was no evidence the petitioner, also convicted of felony murder, took any act intended to kill. However, the "reckless disregard for human life" shown by Mr. Tison, in addition to his presence during the entire sequence of criminal activity, constituted sufficient culpability for the imposition of the death penalty. 481 U.S. at 151.

Here, the district court found the *Tison* analysis to apply to Mr. Brown: he was "actively involved" in the underlying felony of robbery, and was "present during the entire sequence of criminal activity culminating in the murder of Yost." Dist. Ct. Rec. doc. 28, at 52.

Before us, Mr. Brown argues that he was not a major participant in the felony and that he did not act with reckless disregard for human life. Although he was physically present, he contends that he did not inflict any blows and did not have any intent to kill Mr. Yost. Finally, Mr. Brown reminds us that Mr. Harjo, who did inflict the blows, did *not* receive the death penalty. Nevertheless, our precedents do not consider different results among defendants when analyzing sufficiency of the evidence matters. The OCCA's analysis was amply supported by sufficient evidence and not an unreasonable application of federal law.

35

### 3. Constitutionality of the HAC aggravator

The OCCA concluded that "[t]he heinous, atrocious or cruel" aggravator has been analyzed thoroughly and, when properly limited by the conditions precedent of torture or serious physical abuse, found to be consistent with the mandates of the Eighth and Fourteenth Amendments. *Brown*, 989 P.2d at 931 (quoting *Toles v. State,* 947 P.2d 180, 192 (Okla. Crim. App. 1997)). We decline the invitation to deviate from our previous holdings. *See Workman v. Mullin*, 342 F.3d 1100, 1115-16 (10th Cir. 2003).

Before us, Mr. Brown acknowledges that our precedent forecloses this challenge, but raises this issue only to preserve it for possible en banc or Supreme Court review.

## G. Application and constitutionality of the continuing threat aggravator

Next, Mr. Brown challenges the sufficiency of evidence supporting the imposition of the continuing threat aggravator, arguing that its application violated his Eighth and Fourteenth Amendment rights. The OCCA held that:

> the evidence was sufficient from which the jury could find the possibility that Brown would commit future acts of violence which would constitute a continuing threat to society. The State introduced evidence that Brown, in three different instances, had illegally in his possession loaded firearms. The State also introduced evidence that Brown had been involved in the beating of a female. These prior criminal activities provided sufficient competent evidence to support the continuing threat aggravating circumstance.

989 P.2d at 932.

Mr. Brown argues that the offenses the OCCA relied on were unadjudicated

36

and thus not constitutionally sufficient evidence to support the aggravator.  Mr. Brown recognizes that our precedent does not preclude a sentencing body in a capital case from considered unadjudicated bad acts.  *Hatch v. Oklahoma*, 58 F.3d 1447, 1465  (10th Cir. 1995) (holding that "the admission of evidence of unadjudicated offenses at a sentencing proceeding does not violate due process"). He urges this court to conclude that the unadjudicated offenses were relatively minor (mere possession of a firearm and one fist fight by an 18-year-old) and thus do not constitute sufficient evidence to support the aggravator.  He argues that there is no evidence the possession of the firearm was illegal, which he says is required before a court may even consider the act.  However, our precedent does not limit the consideration of prior bad acts in this manner.  *See Smith v. Gibson*, 197 F.3d 454, 460 (10th Cir. 1999) (holding that the "admission of unadjudicated bad acts during a capital sentencing proceeding does not violate due process")**.** Thus, the OCCA's decision was not contrary to or an unreasonable application of federal law.

Similarly, circuit precedent forecloses Mr. Brown's challenge to the constitutionality of the continuing threat aggravator, which he raises to preserve the claim for Supreme Court review.  Under Oklahoma law, the continuing threat factor requires "[t]he existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." OKLA. STAT. ANN. tit. 21, § 701.12(7).  We have repeatedly upheld the

37

constitutionality of this aggravating factor, finding it neither unconstitutionally vague nor overbroad. *See Ross v. Ward*, 165 F.3d 793, 800 (10th Cir. 1999); *Castro v. Ward*, 138 F.3d 810, 816-817 (10th Cir. 1998); *Nguyen v. Reynolds*, 131 F.3d 1340, 1353-54 (10th Cir. 1997).

## H. Application of the killing to avoid arrest aggravator

Mr. Brown next challenges the application of the killing to avoid arrest aggravator. During post-conviction proceedings, the OCCA determined that this contention was not raised on direct appeal: "Brown has not shown that the facts or law supporting this claim were unavailable to direct appeal counsel." Unpublished Op. Denying Relief, filed Nov. 8, 1999, in Case No. PC-98-1251, at 3. Thus, the OCCA held Mr. Brown waived this contention. *Id.*; *see* OKLA. STAT. ANN. tit. 22, §§ 1080-1089.[2]

The district court noted the procedural bar imposed by Okla. Stat. Ann. tit. 22, § 1086, 1089. Section 1089(C) provides that only matters which were not and could not have been raised in direct appeal can be raised during post-conviction review. *See* OKLA. STAT ANN. tit. 22, § 1089(C)(1); Rule 9.7(B)(1) and (2), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1996);

---

[2] Oklahoma's Post-Conviction Procedure Act, Okla. Stat. Ann. tit. 22, §§ 1080-1089, "embodies the principles of res judicata and precludes state collateral review of issues actually raised on direct appeal, as well as those issues that could have been raised on direct appeal, but were not." *Brecheen v. Reynolds*, 41 F.3d 1343, 1349 n.4 (10th Cir. 1994).

*Coleman v. Thompson*, 501 U.S. 722, 754 (1991) ("[T]he petitioner . . . must bear the burden of a failure to follow state procedural rules."). "On habeas review, this court will not consider issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Hickman v. Spears*, 160 F.3d 1269, 1271 (10th Cir. 1998). Like the district court, then, we typically cannot review the claim without Mr. Brown's establishing either (a) cause and prejudice from his failure to raise the claim on direct review or (b) a fundamental miscarriage of justice resulting from this court's failure to review. *Coleman*, 501 U.S. at 750. However, in the interest of efficiency, we have held that "[w]e can avoid deciding procedural bar questions where claims can readily be dismissed on the merits." *Snow v. Sirmons*, 474 F.3d 693, 717 (10th Cir. 2007). This exception applies here.

The avoid arrest aggravator requires the State to prove beyond a reasonable doubt:

(1) there was another crime separate and distinct from the murder; and (2) that Mr. Brown committed the murder with the intent to avoid being arrested or prosecuted for that other crime.

OKLA. STAT. ANN. tit 21, § 701.12(5); *Mitchell v. State*, 136 P.3d 671, 677 (Okla. Crim. App. 2006).

Here, the State proceeded with two theories of first-degree murder – felony murder during the commission of the crime of robbery with a dangerous weapon, and first-degree malice murder. The jury was allowed to find him guilty under

39

either theory. Additionally, the State charged and the jury found Mr. Brown guilty of robbery with a dangerous weapon. Under *Alverson v. State*, 983 P.2d 498, 521 (Okla. Crim. App. 1999), if the jury did not specify which of these two offenses it found, then the verdict will be interpreted as felony murder. Thus, under Mr. Brown's theory, there is no "separate and distinct" predicate crime for the jury to find this aggravator. *See id.* at 520 (listing "requirements" of avoid arrest aggravator as "(a) a predicate crime existed, apart from the murder, from which the defendant sought to avoid arrest/prosecution; and (b) the State presented evidence establishing the defendant's intent to kill in order to avoid arrest/prosecution").

But, the OCCA has held that in such instances the underlying felony can be the basis for the avoid arrest aggravator.

> In most cases in which the avoid arrest aggravator is found by the jury, the "predicate crime" is *also charged as a separate crime and results in a separate conviction.* Such cases typically involve *first-degree malice murder convictions,* with separate convictions for robbery, burglary, rape, kidnaping, or one or more other murders. This separate crime (or crimes) then also constitutes the predicate crime for the avoid arrest aggravator in the second stage of the capital trial. Similarly, in cases in which the capital defendant is charged *with first-degree felony murder, the crime that serves as the underlying felony for the murder conviction can also serve as the predicate crime for the avoid arrest aggravator in the second stage.*

*Mitchell*, 136 P.3d at 677-78 (emphasis added) (footnotes omitted); *see also Wackerly v. State*, 12 P.3d 1, 14 (Okla. Crim. App. 2000) (reasoning that robbery and murder can be contemporaneous and that evidence may be sufficient to

40

support a finding that a murder was committed to avoid arrest or prosecution). In light of the OCCA's interpretation of what constitutes a "separate and distinct" crime, we conclude that the trial court properly instructed the jury on the avoiding arrest aggravator, and thus that Mr. Brown's claim is without merit.

## I. Victim Impact Evidence

In his ninth contention, Mr. Brown maintains that the admission of irrelevant victim impact evidence from the victim's wife, Angela Yost, and mother, Alma Dorn, rendered the sentencing proceeding of his trial fundamentally unfair. *See Payne v. Tennessee*, 501 U.S. 808 (1991). He also argues that the victim impact evidence acted as an improper "super-aggravator" and is thus unconstitutional.

### 1. Irrelevant victim impact evidence

In rejecting Mr. Brown's assertions, the OCCA held:

In this case, Brown complains about statements from the victim's wife stating she enjoyed cooking and ironing for the victim. This evidence is relevant to show the psychological, emotional and physical impact of the victim's death. Brown complains about the victim's mother's statements about Yost's long term plans for the future. The victim's mother also stated that the victim told her that he would take care of her in her old age and for her not to worry about the future. These statements were relevant to show the financial and emotional impact of the crime itself on the victim's survivors. Brown claims that the mother's statement was hearsay. Arguably the statement was not offered for the truth of the matter asserted, thus not hearsay. The statement was only offered to show that the victim's mother believed that the victim would take care of her financially in the future.

The victim's wife testified that the victim was especially fond of Christmas holidays because he was raised in a family that did not

41

celebrate Christmas. The victim's Mother testified that she didn't have any problems with the victim as a child. *Statements about a victim's childhood have no relevance in victim impact evidence. We find that these comments amounted to error, but they do not rise to the level of plain error*, because they did not go to the foundation of the case, or take from Brown a right essential to his defense.

989 P.2d at 933 (emphasis added) (citations omitted).

The district court carefully considered each of the challenged statements, in particular, the erroneously admitted testimony. Interestingly, we note that Mrs. Yost's testimony followed that of State expert Dr. Ronald F. DiStefano, who testified in part about the erroneously admitted post-autopsy photograph. After Mrs. Yost, the victim's wife, read her statement, defense counsel called to the court's attention that a member of the Victim Witness Center was crying in the courtroom. The judge asked defense counsel to ask the weeping person to leave the courtroom. The victim impact testimony from Mrs. Dorn, the victim's mother immediately followed. In the end, the district court determined that the erroneously admitted remarks from both the victim's mother and wife did not so infect the sentencing proceeding as to render it fundamentally unfair.

After reviewing the OCCA's conclusions, we agree with the district court's analysis. Much of the challenged victim impact testimony was apparently available to counsel before trial, although we acknowledge that counsel could likely not foresee the emotional outburst from courtroom observers. We have rejected such an objection in a similar context:

[Counsel] did not challenge its admission until after the entire statement

42

> was read to the jury. The absence of a contemporaneous objection deprived the trial court of the ability to curtail any troubling portions of the statement. Counsel's argument that he could not foresee the extreme emotional impact of the victim impact statement is particularly unconvincing when there is but one impact statement to be read by a family member.

*Short v. Sirmons,* 472 F.3d 1177, 1193 (10th Cir. 2006), *cert. denied*, 128 S. Ct. 103 (2007). Moreover, even if we accept Mr. Brown's contention that the jury inappropriately considered portions of Mrs. Yost's and Mrs. Dorn's testimony, any error was harmless. The irrelevant testimony regarding Mrs. Yost's enjoyment of cooking and ironing for the victim and involving Mr. Yost's childhood could not have influenced the jury's finding as to two of the three statutory aggravating factors:

(1) that Mr. Brown constituted a continuing threat to society, or

(2) that he committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution. Thus, the OCCA's rejection of Mr. Brown's contention was not an unreasonable application of federal law.

*2. Victim Impact Evidence as a "superaggravator"*

Mr. Brown next argues that the victim impact evidence was essentially a "superaggravator," in that it unconstitutionally skewed the weighing process in favor of finding the statutory aggravating factors.

In the sentencing phase, the prosecution incorporated all of the first stage evidence in support of aggravating factors. In addition to the above-described victim-impact testimony from Dr. DiStefano, Mrs. Dorn, and Mrs. Yost, the State

43

presented the following evidence in support of the statutory aggravators:

(1) Officer Herbert Hardman of the Tulsa police department testified that on October 15, 1992, during a traffic stop (where Mr. Wilson was the driver and Mr. Brown the passenger), he observed a handgun lying in the front seat of the suspects' vehicle. Both Mr. Wilson and Mr. Brown claimed ownership of the weapon.

(2) Officer Timothy J. Pike of the Tulsa police department testified that on June 1, 1993, after responding to a call and observing open container of alcohol in a vehicle, he asked Mr. Brown, seated in the passenger's seat of a car, to step out of the car. Officer Pike recovered two semiautomatic weapons from the vehicle.

(3) Anita Kaiser testified that on the evening of September 25, 1993, she was attacked by about sixty African-American men when approaching her boyfriend's apartment in Tulsa, and that the crowd also attacked and injured her boyfriend, Ronald Kirkpatrick, who tried to rescue her.

(4) Officer Roy C. Johnson of the Tulsa police department testified that on the evening of September 25, 1993, he responded to the call involving Ms. Kaiser, where in excess of twenty men were "running and fighting all over the place." Tr. dated Feb. 18, 1997, at 61. He testified that he observed Mr. Brown "kicking and stomping" Ronald Kirkpatrick.

(5) Sergeant Samuel McCullough of the Tulsa Police Department testified that on February 16, 1995, he pulled over Mr. Wilson for speeding. Mr. Brown

44

was a passenger in the car. Sergeant McCullough observed a black aluminum baseball bat consistent with the one used to kill Mr. Yost lying between the two front seats. Sergeant McCullough testified he retrieved a .25 caliber automatic pistol under the passenger's (Mr. Brown's) seat.

(6) Sergeant Victor Regalto, also of the Tulsa Police Department testified that he assisted Sergeant McCullough on the February 16, 1995 stop, transported and booked Mr. Brown, and turned the weapon into the property room at the station.

The defense presenting the following witnesses in support of mitigating circumstances:

(1) Santanya Hill, with whom Mr. Brown was romantically involved, had known Mr. Brown since he was eight-years-old. She testified that he took care of her two-year-old daughter, and treated her as though she were his own.

(2) Carl Tarver, who was an Assistant Principal at Mr. Brown's middle school, testified that as a young teenager, Mr. Brown was not aggressive, and was appreciative of Mr. Tarver's advice and guidance. Mr. Brown expressed his ambitions and goals, and successfully got a job after graduation.

(3) Harry Cooper, a long-time family friend, testified that Mr. Brown was a normal, non-aggressive teenager.

(4) Roberta Brown, Mr. Brown's aunt, testified Mr. Brown was respectful, caring, sensitive, and non-violent.

(5) Sandra Glover, who knew Mr. Brown's family for about five years, testified that Mr. Brown and her three children were part of a good group of neighborhood kids, who were not troublemakers. She also testified that Mr. Brown loved his father, respected his opinion, and cared for his brother very much.

(6) Mollie Miller, Mr. Brown's great-aunt who works as an elementary teacher, testified that throughout his life Mr. Brown had never been violent in her presence, and demonstrated good manners and obedience. She had seen him often at his mother's house, where he helped her sister, his grandmother, who was a very ill invalid. He helped take care of her, and fed her, and did so in a gentle manner. She testified that his life retained value.

(7) Jerald Brown, Mr. Brown's uncle who works as a youth guidance specialist, knew Mr. Brown to be a non-aggressive, non-violent person. He testified that Mr. Brown's life still had value.

(8) Papallia Brown, testified that Mr. Brown, her only child, was a passive, sensitive, meek, and mild child whose life still had value.

(9) Dunbar Brown testified that he was close to his son. He testified Mr. Brown was kind and easygoing, and never showed violence or aggression, and that he still had value in his life.

(10) Rev. Pollie Ragsdale, Mr. Brown's great aunt, testified that he was never disrespectful. She asked the jury to show mercy and to spare his life.

46

(11) Fran St. Peter, a clinical social worker, testified that, after reviewing the case file, including the videotapes, autopsy reports, and defendants' statements, she believed that Mr. Brown still could be helped. He may have suffered from alienation – his parents divorced when he was young, his grades slipped precipitously and no one took notice, he helped care for a child that was not his, and his mild demeanor made him a follower of sorts – which might help explain his involvement in the murder. She noted that Mr. Brown had never received any professional treatment, thus its rehabilitative likelihood had not been measured. She noted that Mr. Brown's very supportive family lent support to her theory that Mr. Brown might be helped in the future.

Considering the entirety of evidence presenting during the sentencing stage, the OCCA rejected Mr. Brown's contention that the victim impact testimony served as an unconstitutional "superaggravator." Specifically, the OCCA held:

> We have previously held that victim impact evidence is very different and serves a different purpose than aggravation evidence. The State is still required to prove at least one aggravator beyond a reasonable doubt before the death penalty may be imposed.
>
> In this case, the jury was specifically instructed that they could only consider the aggravating circumstances set forth in the instructions. Brown has not convinced us that the jury would not have found the aggravating circumstance but for the victim impact evidence.

989 P.2d at 933 (citations omitted).

The district court found that jury properly instructed on aggravating

circumstances and that the use of victim impact evidence in general under Oklahoma law and specifically in Mr. Brown's trial did not deprive him of his Eighth Amendment rights.  We agree that the OCCA's decision withstands AEDPA deference.

States may choose to allow victim impact testimony, *see Payne*, 501 U.S. at 827, and Oklahoma allows testimony about a crime's impact on the victims provided the testimony does not violate due process.  *See Cargle v. Oklahoma*, 909 P.2d 806, 826 (Okla. Crim. App. 1995).  As such, we hold that the OCCA's decision was not an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d)(1).

## J. Cumulative error

In Mr. Brown's final contention, he maintains that the cumulative effect of the guilt and sentencing stage errors is manifest and clearly resulted in a fundamentally unfair trial and a denial of constitutional due process.  The OCCA rejected this claim because it determined that any errors were harmless, even in the aggregate.  989 P.2d at 935 ("In viewing the cumulative effect of these errors we also find they do not require reversal of this case.").

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."  *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002) (quotation omitted).  We have found no

48

additional constitutional errors, and thus we only review the OCCA's decision under our deferential AEDPA standard. *See Cargle,* 317 F.3d at 1206. Given this level of deference, we cannot determine that the OCCA's evaluation of the cumulative impact of the trial court errors was contrary to or an unreasonable application of clearly established federal law.

## IV. CONCLUSION

Accordingly, we AFFIRM the judgment of the district court denying Mr. Brown's 28 U.S.C. § 2254 petition.